## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-1662 |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| *Defendant*. | ) | |

## COMPLAINT

Plaintiff Jane Doe brings her Complaint against Defendant Fairfax County School Board ("School Board" or "Defendant"), the government entity that governs the Fairfax County Public Schools ("FCPS"), and in support thereof, states as follows:

## INTRODUCTION

1.     This civil rights action arises under the Free Speech, Equal Protection, and Due Process Clauses of the United States and Virginia Constitutions, as well as under Title IX of the Education Amendments of 1972 ("Title IX") and the Free Exercise of Religion Clause of the Virginia Constitution.

2.     The Defendant violated the Plaintiff Jane Doe's ("Doe") rights under the United States and Virginia Constitutions by imposing broad and vague speech requirements, backed by threats of severe discipline, that compelled forced speech or implied agreement with views that the Plaintiff objected to on religious and secular grounds. The speech regulations forced the Plaintiff to either self-censor so as not to face discipline for speaking her true beliefs or to engage in speech with which she disagreed.

3.      The School Board also violated Doe's equal protection, due process, and Title IX rights by allowing a male to feel safe and comfortable by using a common female restroom for his comfort, while requiring Doe to either share the common female restroom with a male or find a private restroom.

## PARTIES, JURISDICTION, AND VENUE

4.      At all relevant times, Doe was a resident of Fairfax County, Virginia, and a high school student at an FCPS school. Doe is currently a college student residing in Lancaster County, Nebraska, but returns to Virginia during school breaks.

5.      The School Board is the public body that governs the FCPS. It is located in Fairfax County, Virginia.

6.      The Court has subject-matter jurisdiction over the federal claims herein pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a) (deprivation of a federal right).

7.      The Court has subject-matter jurisdiction over the state-law claims herein pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) because these claims are sufficiently related to the federal claims in this action such that they form part of the same case or controversy.

8.      This Court has the authority to award the requested damages pursuant to 28 U.S.C. § 1343, as well as costs and attorneys' fees under 42 U.S.C. § 1988.

9.      Venue is proper in this Court because the acts supporting this Complaint took place in this district and because Defendant has its principal place of business in this district.

10.     No part of this case is time-barred. This case was originally brought on March 5, 2024, in the Circuit Court for Fairfax County. *Doe v. Fairfax County School Board*, Case No. CL-2024-3171 (Cir. Ct. Fairfax Cnty.). On September 15, 2025, Doe nonsuited the state court action. The Order of Nonsuit was entered on September 25, 2025. Exhibit A.

11.    Pursuant to VA. CODE § 8.01-380, the statute of limitations is tolled.

12.    Further, VA. CODE § 8.01-380(A) allows the nonsuited action to be refiled in the federal court with appropriate jurisdiction.

## FACTS

### *FCPS Regulations and Guidance Documents*

13.    The School Board has final policymaking and decision-making authority for rules, regulations, and decisions that govern school division personnel.

14.    Ever since it has been providing common restrooms and locker rooms, the School Board has maintained such facilities for students by separating them according to sex: male and female.

15.    The Virginia Constitution explicitly states that this form of separation of the sexes does not constitute discrimination. VA. CONST. art. I, § 11.

16.    Over the past ten years, the School Board has acted with purpose and intent to eliminate sex-based protections for its students in order to protect "gender identity."

17.    In 2015, the School Board amended its non-discrimination policy to add "gender identity" as a protected class. The amendment was passed despite concerns expressed by community members and some school board members that protecting "gender identity" would result in discrimination on the basis of sex in violation of state and federal law.

18.    In 2018, the School Board voted to replace the term "biological gender" from its curriculum and replace it with the term "sex assigned at birth." During the vote to ultimately recommend that changed language to the School Board, a member of the committee charged with those recommendations stated that "biological sex is meaningless."

19.    In 2019, the School Board stated that it carried out its non-discrimination policy on a case-by-case basis, exploring with individual students the use of pronouns and names, providing support to families, and ensuring appropriate access to school facilities, including permitting students to use the restrooms corresponding to their gender identity when requested.

20.    On October 9, 2020, pursuant to Policy 1450, the FCPS's non-discrimination policy, the School Board adopted the first iteration of Regulation 2603 entitled "Gender-Expansive and Transgender Students."

21.    This regulation has since been superseded by Regulation 2603.2, which took effect on April 21, 2022. Exhibit B.

22.    According to Regulation 2603.2, its purpose is "To establish procedures and guidelines for schools to ensure that *all students*, including gender-expansive and transgender students experience a safe, supportive, and inclusive environment." Ex. B at 2 (emphasis added).

23.    Regulation 2603.2 states: "Students who identify as gender-expansive or transgender should be called by their chosen name and pronouns, regardless of the name and gender recorded in the student's permanent pupil record." Ex. B at 4.

24.    On its face, Regulation 2603.2 is unclear and vague as it is worded.

25.    Regulation 2603.2 does not define "transgender" or "gender expansive."

26.    Some FCPS administrators act upon the belief that that Regulation 2603.2 applies to students, while others act upon the belief that it only applies to staff.

27.    Notably, in December of 2023, the Supreme Court of Virginia ruled that a policy similar to Regulation 2603.2 unconstitutionally deprived a teacher of his free exercise, free speech, and due process rights. *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504 (2023).

28.     Despite this guidance from Virginia's highest court, the School Board has made no changes to Regulation 2603.2 since that ruling.

29.     Also in 2020, the School Board published a document entitled "Regulation 2603 Gender-Expansive and Transgender Students Guidance Document." Exhibit C. The 2020 Guidance Document is available to FCPS staff, but is not provided to students.

30.     The 2020 Guidance Document defines "Gender identity" as, "A person's sense of their own identity as a boy/man, girl/woman, something in between, or outside the male/female binary. Gender identity is an innate part of a person's identity and can be the same or different than the sex assigned at birth." *Id.* at 6.

31.     The Guidance Document defines "transgender" as "an individual whose gender identity is different from that associated with the individual's sex assigned at birth. An individual can express or assert a transgender identity in a variety of ways, such as pronoun usage, mannerisms, and clothing. Medical treatments or procedures are not considered a prerequisite for identifying students as transgender." *Id.* at 7.

32.     The Guidance Document defines "gender-expansive / gender non-conforming / gender-diverse / gender-fluid / gender-non-binary / agender / genderqueer" as, "Terms that convey a wider, more flexible range of gender identity and expression than typically associated with the social construct of a binary (two discreet and opposite categories of 'male and female') gender system." *Id*. at 6.

33.     Regulation 4952.5 is a School Board document titled "Equity and Compliance: Discrimination and Harassment Based on a Protected Class." The current version of this document

took effect September 8, 2025. Prior to that, Regulation 4952.4 was in effect from March 15, 2022, to September 8, 2025.

34.     Regulation 4952.4 prohibits "gender-based harassment," which it defines to include "harassment based on sexual orientation and gender identity/expression." Exhibit D at 3.

35.     In August 2022, the School Board sent each student a digital or hard copy of the 2022–23 FCPS "Student Rights & Responsibilities" guide ("SR&R"). Exhibit E.

36.     The SR&R included a signature sheet that parents were required to sign and return acknowledging receipt of the document. *Id.* at 4.

37.     The 2022–23 SR&R also stated that students have, "The right to be called by their chosen names and pronouns." *Id.* at 11.

38.     Appendix D of the 2022–23 SR&R, which is entitled "Student Rights and Responsibilities," is FCPS Regulation 2601.36P. *Id.* at 51.

39.     This Regulation specifies disciplinary actions that the school can, or must, administer for violations of various policies.

40.     Regulation 2601.36P (Code RB9h) provides for discipline for "slurs based upon the actual or perceived gender identity (which includes, but is not limited to, malicious deadnaming or malicious misgendering)." *Id.* at 72.

41.     While Regulation 2601.36P defines "malicious" as "intending or intended to do harm," *id.* at 116, "malicious misgendering" only requires a general intent to misgender without requiring specific intent to cause harm.

42.     Regulation 2601.36P (Code RB9i) also provides for discipline for students who use "slurs based upon the actual or perceived gender expression." *Id.* at 72.

43.    Regulation 2601.36P (Code BSC8f) provides for discipline for "Discriminatory harassment (includes harassing conduct): Gender identity." *Id.* at 73.

44.    There is no requirement that discriminatory harassment based on gender identity be "severe, pervasive, and objectively offensive." *Id.*

45.    Regulation 2601.36P does not define "gender identity" or "gender expression."

46.    FCPS has trained its staff that "purposeful misgendering" is prohibited.

47.    Standard disciplinary measures for violations of Codes RB9h, RB9i, and BSC8f are Level 2 and Level 3, with an option for Level 4 discipline for a violation of BSC8f.

48.    Level 2 and Level 3 disciplinary measures include punishments such as weekday detention, Saturday detention, removal from student activities for up to 14 calendar days, out-of-school suspension, and "behavioral instruction." *Id.* at 78–80.

49.    Level 4 disciplinary measures include punishments such as referral to the IEP team, removal from student activities for 21 days, out-of-school suspension, and possible referral to law enforcement.

50.    The School Board's policies, then, provide for immediate discipline of up to a three-week suspension for "misgendering" even when based on a good faith belief in the listener's gender, without specific intent to harm, and/or not "severe, pervasive, and objectively offensive." *Id.* at 72.

51.    The School Board made changes to the SR&R for the 2023–24 school year, but the definitions, prohibitions, and disciplinary options described above remain the same. Exhibit F.

52.    Regulation 2603.2 also states: "Gender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity [] In no case shall a gender-expansive or transgender student be required to use a locker

7

room or restroom that conflicts with the student's gender-identity or be limited to using only a private area, single occupancy accommodation, or other single-use facility." Ex. B at 5–6.

53. For students who object to sharing a common restroom or locker room with a member of the opposite sex, Regulation 2603.2 requires that they "Shall be provided with a reasonable, non-stigmatizing alternative, such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, or a nearby health or single-use/unisex bathroom), or with a separate changing schedule (e.g., using the locker room that corresponds with the student's gender identity before or after other students)." Ex. B at 5.

54. The School Board does not require parental notification or consent before permitting those students to be referred to by chosen names and pronouns that do not match their sex.

55. The School Board does not require parental notification or consent before allowing students to use a common restroom or locker room that does not match their sex.

56. The School Board does not require students to "consistently, persistently, and insistently" identify as the opposite sex before requiring that those students be referred to by chosen names and pronouns that do not match their sex.

57. The School Board does not require students to "consistently, persistently, and insistently" identify as the opposite sex in order for students to use a common restroom or locker room that does not match their sex.

58. The School Board also does not require students to be diagnosed with gender dysphoria or provide documentation that they have legally changed their name or sex before requiring that those students be referred to by chosen names and pronouns that do not match their sex.

59.     The School Board also does not require students to be diagnosed with gender dysphoria or provide documentation that they have legally changed their name or sex in order for students to use a common restroom or locker room that does not match their sex.

60.     The School Board does not require students to notify or seek approval from staff before requiring that they be referred to by chosen names and pronouns that do not match their sex.

61.     The School Board does not require students to notify or seek approval from staff for students to use a common restroom or locker room that does not match their sex.

62.     The School Board allows students to use opposite sex common restrooms or locker rooms based solely on students' subjective sense of comfort and makes no attempt to address the use of opposite sex common restrooms or locker rooms on a case-by-case basis.

### *Jane Doe's Education History and Beliefs*

63.     At all times relevant to the facts giving rise to this Complaint, Doe was an FCPS high school student.

64.     Doe consistently attended FCPS from elementary school until she graduated.

65.     Doe was at all relevant times and remains a practicing Roman Catholic who strives daily to live in accordance with her faith.

66.     Doe has been catechized in Catholic doctrine and sacramentally received Baptism, Confession, the Eucharist, and Confirmation. She regularly attends Catholic Mass and participated in youth groups through the Catholic Church.

67.     Because of her beliefs as a practicing Roman Catholic, Doe has sincerely held beliefs that govern her views about human nature, marriage, gender, sexuality, morality, politics, ethics, natural law, and social issues.

68.     Through her faith as a practicing Roman Catholic, Doe has learned and sincerely believes that God creates each person as male or female, that the complementary sexes reflect the image of God, that sex cannot be altered, and that rejection of one's biological sex is a rejection of the image of God within that person.

69.     This is contrary to the School Board's belief that the "binary … gender system" is a "social construct"—i.e., invented by humans rather than by God—and results in her being unable to speak in the way the School Board demands.

70.     Furthermore, Doe believes that to acknowledge or endorse that sex can be altered is to speak against God and her sincerely held religious and philosophical beliefs.

71.     Doe further believes that referring to another person using pronouns that do not correspond with biological sex is harmful to that person because it is false.

72.     Doe further believes that being required to refer to another person using pronouns that do not correspond with biological sex is harmful to her because it forces her to lie.

73.     Doe also believes that, based on scientific evidence, there are only two anatomical sex presentations, which are male and female.

74.     Doe supports the right of students to choose to refer to other students and teachers by their chosen pronouns, even when they do not correspond to biological sex.

75.     Doe does not support, however, any government policy compelling students to refer to other students and teachers by their chosen pronouns when they do not correspond with biological sex, and she strongly objects to any attempt to make her endorse, adopt, or otherwise engage in such speech.

76.     In short, Doe supports the right of others to make statements consistent with their beliefs even when those beliefs contradict her own, but she does *not* support requiring her and

people who share her beliefs to speak in a manner that follows the beliefs of government officials and contradicts the speaker's own religious beliefs.

### The Bathroom Incident

77.    On May 17, 2023, Doe was entering a female restroom at West Springfield High School. Knowing that someone was behind her but not knowing who, she held the door open for that person.

78.    Doe then realized that she was holding the door open for a male student, who was a freshman at the time, and who was significantly larger than Doe. To protect his privacy, that male student will be referred to herein as Richard Roe ("Roe").

79.    Roe did not identify as a female and has never identified as female.

80.    Roe did not identify as transgender on May 17, 2023.

81.    Roe has not identified as transgender since that time.

82.    Doe did not feel comfortable sharing a restroom with a male and instead used a different restroom.

83.    On May 18, 2023, Doe told her mother that there was a male using the female restroom at her school and that this had been a regular occurrence.

84.    Shortly after receiving this information from Doe, her mother called the school principal.

85.    She informed him that her daughter told her that a male student was regularly using the female restrooms at FCPS, that her daughter witnessed this the day before when attempting to use the restroom, and that her daughter was so uncomfortable with this that she immediately went to find a different restroom.

86.    Doe's mother told the principal Roe's name, the time of the incident, and the bathroom location, and the principal told her that he would review all relevant video footage and investigate the matter.

87.    Doe's mother asked if anything could be done to prevent Roe from using the female restroom in the future, and the principal responded by citing the SR&R and stating that school policy allows students to use the restroom that aligns with their declared gender identity.

88.    Following the call, Doe's mother sent an email to the principal reiterating her concerns and included information about Roe. Exhibit G.

89.    On May 19, 2023, the principal replied and asked for a time to discuss the matter with Doe's mother.

90.    Doe's mother was traveling during the time when the principal sent his response email and did not see it, so on May 23, 2023, he again replied to the original email from Doe's mother, thanking her for contacting him and providing a map of individual restrooms for Doe to use. Exhibits G, H.

91.    According to the map provided to Doe's mother by the principal, the high school has nine common female restrooms spread across three floors.

92.    The principal said that Doe could use one of four restrooms: two single-use restrooms on the first floor, one single-use restroom on the second floor, and the health clinic on the second floor.

93.    At the time he told Doe's mother that Doe could use a private restroom if she felt uncomfortable sharing a female common restroom with Roe, the principal had no information that would suggest that Roe identified as anything other than male.

94.     Thereafter, Doe's mother emailed an FCPS assistant superintendent, asking for a phone call "to discuss an incident that keeps happening in my daughter's school, keeping her and other girls from feeling safe in their bathrooms." Exhibit I.

95.     Doe's mother spoke to the assistant superintendent on May 30, 2023. The assistant superintendent indicated that she was made aware of the details through the principal and confirmed that the SR&R and Regulation 2603.2 allowed students to use restrooms that correspond to their gender identity.

96.     At the time that she said this, the assistant superintendent had no information that would suggest that Roe identified as anything but male.

97.     Doe's mother asked the assistant superintendent what FCPS would do to protect the safety and privacy of her daughter and other girls, and the assistant superintendent responded that it was not her job to set policy, but rather to enforce it.

98.     The assistant superintendent also told Doe's mother that she should be sure to vote in the next school board election.

99.     In late August of 2023, another parent emailed the principal to complain about Roe's use of the female restroom. Exhibit J.

100.    In fact, Roe had been regularly using the female restroom and would continue to do so throughout the 2023–24 school year, not because he identified as a female, but rather because he alleged that he had been bullied in the boys' common restroom.

101.     Roe admitted this in February of 2024 in response to comments on a student-run Instagram page where several anonymous students objected to Roe's use of female restrooms.

102.    In response to these concerns, Roe wrote:

I go in the girls bathroom for safety reason[sic], in the boys bathroom I've been threatened to be jumped multiple times, raped, and screamed at every time. In the girls bathroom no one has ever said anything to me about how they are so uncomfortable, stop being a little bitch behind ur spam account is[sic] embarrassing. My counselor and principal all said I'm allowed to go in there, I don't even look at any of you I go in a stall. You go to a public school not everything is catered to you.

Exhibit K.

103.    Receiving no substantive assistance from FCPS, Doe faced another dilemma. On the one hand, she could continue to use the common-use restrooms, even though it would compromise her right to privacy, safety, and comfort. On the other hand, she could protect her privacy, safety, and comfort by only using one of the four single-use restrooms in the entire high school, which had a student population of over 2,500 students.

104.    Given the inconvenience and unequal access to restrooms where she could feel safe and comfortable, vis-à-vis Roe, Doe chose to limit her use of restrooms as much as possible while at school. Virtually every day thereafter, Doe avoided using school restrooms and only did so when absolutely necessary.

105.    At no point after Doe's mother complained to the principal did the School Board or any other school official prohibit Roe from using the common female restroom, nor did it suggest to Roe that he should use a private restroom. Upon information and belief, the school officials also did nothing to enable Roe to use the common male restroom free from the bullying he alleged and Roe continued to use the common female restroom.

106.    Roe also continued to use the male restroom.

107.    The School Board's accommodation to Roe, a male student, violated Doe's right to equal opportunity in an educational program in violation of Title IX.

108.    Further, the School Board discriminated against Doe, a female student, by limiting her access to safety and comfort in the use of intimate, female-only facilities while providing Roe, a similarly situated male student, with the use of male-only facilities

109.    Finally, Regulation 2603.2 is unconstitutionally vague, and the School Board thus violated Doe's due process rights by its application of Regulation 2603.2 to Roe's use of the female restroom.

**The Board's pronoun policies, practices, and procedures violated the Jane Doe's free speech and free exercise rights under the United States and Virginia Constitutions.**

110.    Doe received and reviewed the FCPS SR&R Guide as required before each school year. She understood the disciplinary consequences that she would face for "misgendering" another student.

111.    While a student, Doe experienced a culture of fear at FCPS, where students are afraid of getting disciplined or chastised by staff and branded as intolerant or unwelcoming if they did not accept other students' claims that they were "gender-expansive" or "transgender."

112.    Doe understood the SR&R in both 2022–23 and 2023–24 to include Regulation 2603.2, Regulation 1450.7, and Regulation 2601.36P (2022–24)/Regulation 2601.37P (2023–24).

113.    Doe understood that she was subject to reporting, investigation, and discipline for using pronouns that matched another student's sex when that student preferred different pronouns, regardless of whether she had a specific intent to harm that student or whether her act created an objectively hostile educational environment.

114.    Doe does not believe in the concepts or definitions contained in Regulation 2603.2 related to "gender identity," "gender-expansive," and "transgender"—as such definitions are in

direct opposition to their religious beliefs—and thus does not understand how she can avoid violating Regulation 4952.5 and Policy 1450.7.

115.    There is nothing in the School Board's policies or regulations that explains how a student who objects to using another student's preferred name and pronouns should refer to that student without the risk of being reported, investigated, and disciplined. For example, the School Board has refused to confirm that a student can avoid reporting, investigation, and discipline by using initials or last name while referring to a student who chooses to be referred to by pronouns that do not match their sex.

116.    Because of Doe's sincerely held philosophical and religious beliefs, she does not believe in the concept that sex is not immutable, and to endorse or accept the premise of that concept would be to falsely act in contradiction to her beliefs, violating her constitutional rights.

117.    It is also unclear to Doe what conduct or speech would constitute "misgendering" under Regulation 2603.2, Regulation 4952.5, Regulation 2601.36P, and Regulation 2601.37P.

118.    As a result, Doe reasonably feared being subject to reporting, investigation, and discipline for acting and speaking in a way that, although consistent with her sincerely held philosophical and religious beliefs, would be in violation of Policy 1450.7, Regulation 2603.2, Regulation 4952.5, Regulation 2601.36P, and Regulation 2601.37P.

119.    At the beginning of her Senior year, Doe received the SR&R. Unlike in years prior, where parents would merely need to sign and acknowledge receipt and understanding of the rights and responsibilities articulated in the SR&R, FCPS stopped providing parents with hard copies to sign, instead requiring that students (including Doe) watch a video and take a test on the SR&R. Signature and acceptance of the SR&R, a requirement of each student, was predicated on a student

answering 70 percent of the questions "correctly." FCPS staff failed to clearly explain to students that passing the test would result in the signature and acceptance of the SR&R.

120.    The test that Doe was required to take included the following assertion: "A student has the right to be called by their chosen name and pronoun." Exhibit L. Students were required to select "true" or "false," with "true" being counted as the sole "correct" answer.

121.    Aware that the SR&R test posed that question, Doe refused to take the test, as doing so would require her to either speak against her sincerely held philosophical and religious beliefs or speak in confirmation of those sincerely held philosophical beliefs and face potential discipline, chastisement, and/or social ostracization.

122.    Doe was told in person by her teacher that she needed to take the SR&R test, and the teacher gave her a written note that instructed her to take the SR&R test.

123.    The teacher followed up his in-person and written requests to Doe with two emails informing her that she needed to take the SR&R test.

124.    On September 26, 2023, other students who refused to take the SR&R test were required to go to the cafeteria and take the test under supervision. Doe was informed that she must go to the cafeteria to take the SR&R test, but she again refused.

125.    In early October 2023, Doe's mother emailed the school principal to inform him that Jane Doe would not be taking the SR&R test as it constituted "compelled speech" on "gender identity," among other topics that were contrary to their religious beliefs. Exhibit M.

126.    A second FCPS employee then sent an email to Jane Doe's mother, instructing her that there was no opt-out for the SR&R and requiring her to sign, which she did not. *Id.*

127.    Also, during the first week of the 2023–24 school year, one of Doe's teachers discussed the preferred pronouns policy in class at the beginning of the year by reading from a welcome packet, which some teachers indicated had been provided by the school principal. Doe's teacher asked her and her classmates to discuss their preferred pronouns with each other.

128.    Most of Doe's teachers also required students to fill out a "Getting to Know You" form. The form was sent to Doe through Schoology, an internal online platform that teachers used to communicate with students. Doe's teachers told her that the school's principal had requested this form be filled out by students. Exhibit N.

129.    In that form, students were asked to provide their name and, in the line immediately after their name, their "Preferred Name and pronouns."

130.    The question asking for "Preferred Name and pronouns" included an asterisk next to it, indicating that it was required to answer the question in order to submit the form.

131.    During the 2022–23 year, Doe's history teacher had also required students to fill out a similar form, requesting that they provide her pronouns.

132.    Doe believed that answering questions asking her to state her pronouns violated her sincerely held philosophical and religious beliefs, but she nonetheless answered the questions out of fear of discipline, chastisement, and/or social ostracization.

133.    Doe has also been made aware of a similar "Getting to Know You" form required by teachers at a different FCPS high school where students were compelled to answer whether they used "she/her," "he/him," they/them," or "other" pronouns, with a space to enter the pronouns next to "other." Exhibit O.

134.    The students at a separate FCPS high school were also required to answer whether the teachers could "use this pronoun when I contact caregivers?"

135.    On August 22, 2023, Doe's mother emailed the principal about Doe being required to fill out the "Getting to Know You Form," Doe being required to discuss pronoun usage with other students and all of her teachers and discussing pronouns during the first week of school. Exhibit P. Doe's mother also asked about the SR&R test and was told by the principal that it was required for acknowledgment and signature of the SR&R.

136.    Since the enactment of Regulation 2603.2, Doe's teachers expect students to refer to students by their preferred pronouns, even when they do not match their biological sex.

137.    As a result of the School Board's policies, regulations, and practices related to pronoun usage, Doe felt extreme social pressure from FCPS to suppress her sincerely held philosophical and religious beliefs and affirm a concept that contradicts those beliefs—that sex and gender is not an immutable characteristic given by God in his image, but instead fluid, changeable, and properly defined by FCPS policies, regulations, and practices.

138.    Consequently, Doe lived in daily fear that speaking in a manner that is consistent with her sincerely held philosophical and religious beliefs would result in discipline, chastisement, and/or social ostracization.

139.    Doe further felt compelled to make statements implying that the School Board's ideological and religious beliefs were correct and that Catholic beliefs were false.

140.    Doe thus engaged in a practice of self-censoring, in which she attempted, to the best of her ability, to avoid using pronouns altogether when addressing or discussing individuals who she did not know well and could potentially identify as gender expansive or transgender.

141.    This need to self-censor injured Doe by limiting her ability to speak in a manner that did not violate her beliefs and was grammatically proper. Thus, even absent a finding of a violation, the School Board's policies, regulations, and practices harmed students whose religious beliefs on gender differed from those of the School Board by functionally placing restrictions on their ability to interact with other students while students whose beliefs accorded with those of the School Board were able to interact freely.

**The Board's actions since this lawsuit further demonstrate an intent to violate the law.**

142.    Doe initially filed this action on March 5, 2024, in Fairfax County Circuit Court.

143.    In December of 2024, the court overruled the School Board's demurrer as to Doe's claims that the school board violated her right to free speech, free exercise, due process, and equal protection.

144.    On February 14, 2025, the United States Department of Education opened an investigation into the School Board to determine whether its policies, regulations, and practices violated Title IX of the Education Amendments of 1972.

145.    On July 25, 2025, the Department of Education announced that the School Board's bathroom and locker room policies violated Title IX.

146.    The Department of Education proposed to the School Board a resolution agreement that would allow it to continue to receive federal funding if the School Board rescinded its discriminatory restroom and locker room policies.

147.    The School Board rejected the Department of Education's resolution agreement and continues to maintain and apply its bathroom and locker room policies in a manner that intentionally and purposely eliminates sex-based protections for its students.

148.    For example, on September 2, 2025, a 14-year-old girl encountered another male student in the female locker room at West Springfield High School. The male student had facial hair and was wearing pants that were so tight that they clearly outlined his genitalia. While in the female locker room, the male student watched the girls changing for P.E. class.

149.    That male student would continue to use the female locker room and male locker room interchangeably.

150.    When parents complained to administrators at West Springfield High School about the boy using the female locker room, they were told that the boy had a right to use the female locker room and that if any of the girls felt uncomfortable, they would have to use a single occupancy restroom to change for P.E. class.

## COUNT I
### First Amendment: Freedom of Speech (42 U.S.C. § 1983)
**(Compelled Speech, Pronouns)**

151.    Doe incorporates all of the foregoing paragraphs as though fully restated here.

152.    The discussion of how to address individuals claiming to be gender-expansive, issues like gender identity, and whether to alter the use of pronouns or not use pronouns is a matter of public concern and debate.

153.    The discussion of, or response to, individuals claiming to be gender-expansive and issues like gender identity is not curricular speech.

154.    Using or not using pronouns to refer to others is not curricular or academic speech.

155.    It is not lawful for authorities to compel an individual to speak in conformity with the authorities' beliefs on publicly debated topics.

156.    It is not lawful for authorities to chill an individual from speaking in a manner contrary to the authorities' beliefs on publicly debated topics.

157.    Doe's speech, or lack thereof, regarding gender identity is protected by the United States Constitution.

158.    The School Board's policies, regulations, and practices required the School Board or its designees to evaluate the content and viewpoint of student expression to determine whether it is consistent with the beliefs favored by the School Board members.

159.    By threatening to discipline Doe and others for not endorsing the School Board's favored viewpoints or the viewpoints of other students, which the School Board has mandated through its policies, the School Board threatened to punish Doe for exercising her right to engage in speech, or lack of speech, that the United States Constitution protects.

160.    The School Board's policies, regulations, and practices are constitutionally overbroad and chilled Doe's right to engage in speech, or lack of speech, that the United States Constitution protects.

161.    The School Board's policies, regulations, and practices requiring students to refer to transgender and gender expansive students by chosen names and pronouns are not narrowly tailored to achieve a compelling government objective.

162.    As a result of the School Board's policies, regulations, and practices requiring Doe to address other students by names and pronouns that do not align with sex, Doe reasonably self-censored by avoiding the use of pronouns to address or refer to people that she did not know well.

163.    The School Board's policies, regulations, and practices therefore violated Doe's right to freedom of speech under the First Amendment of the United States Constitution.

### COUNT II
### Virginia Constitution: Freedom of Speech (VA. CONST. art. I, § 12)
### (Compelled Speech Pronouns)

164.    Doe incorporates all of the foregoing paragraphs as though fully restated here.

165.    The discussion of how to address individuals claiming to be gender-expansive, issues like gender identity, and whether to alter the use of pronouns or not use pronouns is a matter of public concern and debate.

166.    The discussion of, or response to, individuals claiming to be gender-expansive and issues like gender identity is not curricular speech.

167.    Using or not using pronouns to refer to other students is not curricular or academic speech.

168.    It is not lawful for authorities to compel an individual to speak in conformity with the authorities' beliefs on publicly debated topics.

169.    It is not lawful for authorities to chill an individual from speaking in a manner contrary to the authorities' beliefs on publicly debated topics.

170.    Doe's speech, or lack thereof, regarding gender identity is protected by the Virginia Constitution.

171.    The School Board's policies, regulations, and practices required the School Board or its designees to evaluate the content and viewpoint of student expression to determine whether it is consistent with the mandates of their policies, regulations, and practices.

172.    By threatening to discipline Doe and others for not endorsing the School Board's favored viewpoints or the viewpoints of other students, which it has mandated through its policies, the School Board threatened to punish Doe for exercising her right to engage in speech, or lack of speech, that the Virginia Constitution protects.

173.    The School Board's policies, regulations, and practices are constitutionally overbroad and chilled Doe's right to engage in speech, or lack of speech, that the Virginia Constitution protects.

174.    The School Board's policies, regulations, and practices requiring students to refer to transgender and gender expansive students by chosen names and pronouns are not narrowly tailored to achieve a compelling government objective.

175.    As a result of the School Board's policies, regulations, and practices requiring Doe to address other students by names and pronouns that do not align with sex, Doe reasonably self-censored by avoiding the use of pronouns to address or refer to people that she did not know well.

176.    The School Board's policies, regulations, and practices therefore violated Doe's right to freedom of speech under Article I, Section 12 of the Virginia Constitution.

### Count III
### Virginia Constitution: Free Exercise (VA. CONST. art. I, § 16)
### (Pronouns)

177.    Doe incorporates all of the foregoing paragraphs as though fully restated here.

178.    By threatening to punish Doe for speaking in a manner that violated her sincerely held philosophical and religious beliefs, which manifest in the way that she discusses issues related to gender identity, including the use of pronouns consistent with a person's biological sex, the School Board violated Doe's right to the free exercise of religion under the Virginia Constitution.

179.    Doe's views and expressions related to gender identity, including the use of pronouns, are motivated by her sincerely held religious beliefs and are avenues through which she exercises her faith.

180.    Expressing the School Board's, or another student's, mandated message on gender identity required Doe to violate her sincerely held religious beliefs.

181.    Threatening to punish Doe for not using pronouns that violated her conscience caused her to suffer on account of her religious beliefs.

182.    Threatening to punish Doe for not using pronouns that violated her conscience restricted her ability to live out her daily life in accordance with her faith.

183.    The School Board's regulations and their interpretation and enforcement of the regulations created a religious test for Doe and other students, i.e., whether the students shared the School Board's beliefs on religious questions related to gender.

184.    Indeed, the School Board subjected Doe and other students to a literal religious test, as Doe and other students were given a test where following religious beliefs such as Doe's was counted as incorrect. *See* Exhibit L.

185.    The School Board's policies, regulations, and practices require immediate and mandatory discipline for the violation of the policy. But to comply with these policies, regulations, and practices, and thereby avoid the School Board's disciplinary regime, Doe had to speak and act in ways that were inconsistent with her religious beliefs.

186.    The School Board's policies, regulations, and practices requiring students to refer to transgender and gender expansive students by chosen names and pronouns are not narrowly tailored to prevent some substantial threat to public safety, peace or order.

187.    As a result of the School Board's policies, regulation, and practices prohibiting Doe and others from speaking in a manner that adhered to Doe's religious beliefs instead of the School Board's, Doe was forced to avoid using pronouns to address or refer to people that she did not know well.

188.    The School Board's policies, regulations, and practices therefore violated Doe's rights under Article I, Section 16 of the Virginia Constitution.

**Count IV**
**Fourteenth Amendment: Due Process (42 U.S.C. § 1983)**
**(Pronouns and Restroom)**

189.    Doe incorporates all of the foregoing paragraphs as though fully restated here.

190.    The Fourteenth Amendment of the United States Constitution prohibits the deprivation of liberty without due process of law.

191.    Rules that use terms that are so vague that ordinary citizens must guess at their meaning and will differ as to the rule's application unconstitutionally deprive citizens of liberty without due process of law.

192.    A rule must afford citizens a reasonable opportunity to know what is prohibited in order to comply with constitutional due process requirements.

193.    Rules that restrict or compel speech or action must meet a higher standard of specificity to satisfy constitutional due process requirements.

194.    The School Board's policies, regulations, and practices are unconstitutionally vague, ambiguous, and contradictory both on their face and as applied, because they prohibit harassment on the basis of gender identity or gender expression, yet do not define gender identity or gender expression and do not require the harassment to be severe, pervasive, and objectively offensive.

195.    The School Board's policies, regulations, and practices are unconstitutionally vague because they prohibit harassment on the basis of gender identity or gender expression, yet do not indicate whether the choice to use pronouns that differ from a person's preferred pronouns constitutes harassment when that choice is motivated by a sincere belief that using the preferred pronouns would be inaccurate and dishonest rather than by an intent to harass or otherwise harm.

196.    The School Board's policies, regulations, and practices are unconstitutionally vague because they prohibit "malicious" slurs on the basis of gender identity but provide no guidance as to whether such "malice" requires a specific intent to harm.

197.    The School Board's policies, regulations, and practices are also unconstitutionally vague because they allow students to use opposite sex bathrooms based on classifications that people of ordinary intelligence could not understand.

198.    The School Board's policies, regulations, and practices are unconstitutionally vague because they fail to set out explicit standards for students to be permitted to use opposite sex bathrooms.

199.    The School Board's policies, regulations, and practices are unconstitutionally vague because they allow students to use opposite sex restrooms based on their subjective comfort and arbitrary decisions.

200.    The School Board arbitrarily applied Regulation 2603.2 to Roe, who was not transgender and identified as male, to use a common female restroom while requiring Doe to compromise by either using a common female restroom with a male or using a private restroom.

201.    The School Board's policies, regulations, and practices have therefore violated Doe's rights under the Fourteenth Amendment of the United States Constitution.

### Count V
### Virginia Constitution: Due Process (VA. CONST. art. I, § 16)
### (Pronouns and Restroom)

202.    Doe incorporates all of the foregoing paragraphs as though fully restated here.

203.    Article I, Section 11 of the Virginia Constitution prohibits the deprivation of liberty without due process of law.

204.    Rules that use terms that are so vague that ordinary citizens must guess at their meaning and will differ as to the rule's application unconstitutionally deprive citizens of liberty without due process of law.

205.    A rule must afford citizens a reasonable opportunity to know what is prohibited in order to comply with constitutional due process requirements.

206.    Rules that restrict or compel speech or action must meet a higher standard of specificity to satisfy constitutional due process requirements.

207.    The School Board's policies, regulations, and practices are unconstitutionally vague, ambiguous, and contradictory, both on their face and as applied.

208.    The School Board's policies, regulations, and practices are unconstitutionally vague, both on their face and as applied, because they prohibit harassment on the basis of gender identity or gender expression, yet do not define gender identity or gender expression and do not require the harassment to be severe, pervasive, and objectively offensive.

209.    The School Board's policies, regulations, and practices are unconstitutionally vague, both on their face and as applied, because they prohibit harassment on the basis of gender identity or gender expression, yet do not indicate whether the choice to use pronouns that differ from a person's preferred pronouns constitutes harassment when that choice is motivated by a sincere belief that using the preferred pronouns would be inaccurate and dishonest rather than by an intent to harass or otherwise harm.

210.    The School Board's policies, regulations, and practices are unconstitutionally vague, both on their face and as applied, because they prohibit "malicious" slurs on the basis of gender identity but provide no guidance as to whether such "malice" requires a specific intent to harm.

211.    The School Board's policies, regulations, and practices are also unconstitutionally vague because they allow students to use opposite sex bathrooms based on classifications that people of ordinary intelligence could not understand.

212.    The School Board's policies, regulations, and practices are unconstitutionally vague because they fail to set out explicit standards for students to be permitted to use opposite sex bathrooms.

213.    The School Board's policies, regulations, and practices are unconstitutionally vague because they allow students to use opposite sex restrooms based on their subjective comfort and arbitrary decisions.

214.    The School Board arbitrarily applied Regulation 2603.2 to allow Roe, who was not transgender and identified as male, to use a common female restroom while requiring Doe to compromise by either using a common female restroom with a male or using a private restroom.

215.    The School Board's policies, regulations, and practices have therefore violated Doe's rights under Article I, Section 11 of the Virginia Constitution.

**Count VI**
**Fourteenth Amendment: Sex Discrimination (42 U.S.C. § 1983)**
**(Restroom)**

216.    Doe incorporates all of the foregoing paragraphs as though fully restated here.

217.    The School Board states that all students are equally entitled to a safe, secure, and equitable learning environment.

218.    In May of 2023, the School Board was made aware that Roe, a biological male, was using the common female restrooms. When Doe's mother expressed her daughter's discomfort to the school principal, the School Board told Doe that if she felt uncomfortable sharing the female

common restroom with a male she would be the one that would have to adjust by using one of the limited number of private restrooms at the school.

219.    Despite receiving notice of Roe's use of the common female restroom, the School Board did not prohibit him from such use or direct him to use a private restroom.

220.    The School Board justified its action to Doe's mother by citing Regulation 2603.2, which allows transgender and gender expansive students to use the restrooms of the sex that they identify with.

221.    Roe has never identified as a female and has always identified as a male.

222.    Roe used the female restroom because he experienced bullying in the male restroom. The School Board could have addressed this bullying by taking action to prevent bullying in the male restroom rather than by allowing Roe to use the female restroom.

223.    Thus, the School Board provided male students with common restrooms where female students were not present, but did not provide female students with common restrooms where male students were not present.

224.    The School Board treated Doe and other female students worse than Roe and other male students, and its action was not substantially related to an important government interest.

225.    FCPS denied Doe equal rights to educational benefits based on her sex.

226.    The School Board's actions have therefore violated Doe's rights under the Fourteenth Amendment of the United States Constitution.

**Count VII**
**Virginia Constitution: Sex Discrimination (Va. Const. Art. I, § 12)**
**(Restroom)**

227.    Doe incorporates all of the foregoing paragraphs as though fully restated here.

30

228.    The School Board states that all students are equally entitled to a safe, secure, and equitable learning environment.

229.    In May of 2023, the School Board was made aware that Roe, a biological male, was using the common female restrooms. When Doe's mother expressed her daughter's discomfort to the school principal, the School Board told Doe that if she felt uncomfortable sharing the female common restroom with a male she would be the one that would have to adjust by using one of the limited number of private restrooms at the school.

230.    Despite receiving notice of Roe's use of the common female restroom, the School Board did not prohibit him from such use or direct him to use a private restroom.

231.    The School Board justified its action to Doe's mother by citing Regulation 2603.2, which allows transgender and gender expansive students to use the restrooms of the sex that they identify with.

232.    Roe has never identified as a female and has always identified as a male.

233.    Roe used the female restroom because he experienced bullying in the male restroom. The School Board could have addressed this bullying by taking action to prevent bullying in the male restroom rather than by allowing Roe to use the female restroom.

234.    Thus, the School Board provided male students with common restrooms where female students were not present, but did not provide female students with common restrooms where male students were not present.

235.    The School Board treated Doe and other female students worse than Roe and other male students, and its action was not substantially related to an important government interest.

236.    FCPS denied Doe equal rights to educational benefits based on her sex.

237.    The School Board's actions have therefore violated Doe's rights under Article I, Section 11 of the Virginia Constitution.

## Count VIII
## Title IX: Sex Discrimination (20 U.S.C. 38 §§ 1681 et seq.)
## (Restroom)

238.    Doe incorporates all of the foregoing paragraphs as though fully restated here.

239.    Title IX prohibits discrimination based on sex in any program or activity that receives federal financial assistance.

240.    At all times relevant herein, FCPS was a recipient of federal funds.

241.    Doe, a female, sought the ability to feel safe and comfortable at school by using a common female restroom outside of the presence of males.

242.    Roe, a male, also sought the ability to feel safe and comfortable at school by using a common female restroom outside of the presence of males.

243.    The School Board allowed Roe to feel safe and comfortable at school by using a common female restroom outside of the presence of males, while denying Doe that right.

244.    Likewise, the School Board provided male students with common restrooms where female students were not present, but did not provide female students with common restrooms where male students were not present.

245.    The School Board's actions have violated Doe's rights under Title IX.

### Prayer for Relief

WHEREFORE, Doe respectfully demands the following relief:

a.   Trial by jury for all disputes of fact;

b.   Nominal damages;

c. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, VA. CODE § 57-2.02, and VA. CONST. art. I, §§ 11, 12, and 16;

d. Pre- and post-judgment interest; and

e. Such other relief as the Court deems just and proper.

Respectfully Submitted,

Dated: October 3, 2025

Petitioner,
BY COUNSEL

Andrew J. Block, VSB No. 91537
Ian D. Prior*, DC Bar No. 90001650
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, D.C. 20003
Telephone: (202) 836-7958
Email:  Andrew.block@aflegal.org
        Ian.prior@aflegal.org

Cortland C. Putbrese (VSB #46419)
DUNLAP BENNETT & LUDWIG PLLC
6802 Paragon Place, Suite 410
Richmond, VA 23230
Tel: (804) 977-2688
Email: cputbrese@dbllawyers.com

*Counsel for Petitioner*
*\* Pro hac vice application forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2025, I filed the foregoing with the Clerk of Court using the CM/ECF system. Because no counsel has yet made an appearance in this matter, I will send the foregoing to the below listed counsel who previously represented the Defendant on this matter, accompanied by a request for waiver of service, via electronic mail

Noah P. Sullivan (VSB No. 82698)
GENTRY LOCKE ATTORNEYS
919 E. Main St., Suite 1130
Richmond, Virginia 23219
Tele: (804) 956-2062
Fax: (540) 983-9400
Email: nsullivan@gentrylocke.com

Sona Rewari (VSB No. 47327)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave., NW
Washington, DC 20037
Tele: (202) 955-1974
Facsimile: (703) 918-4018
Email: srewari@hunton.com

    /s/ Andrew J. Block
Andrew J. Block (VSB # 91537)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE, #231
Washington, D.C. 20003
(202) 836-7958
andrew.block@aflegal.org